IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES PENNINGTON, JR., ) | |
| as Guardian of the Estates of James R. ) | |
| Pennington and Jacob Pennington, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:20-CV-11-MAB |
| ) | |
| vs. ) | |
| ) | |
| FLORA COMMUNITY UNIT SCHOOL ) | |
| DISTRICT NO. 35, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This mater is currently before the Court on the issue of a remedy for the disclosure of privileged attorney-client communication by Defendant's retained expert witness, Dr. Alexander Rose (*see* Doc. 72, pp. 16, 21). After reviewing the parties' briefs and relevant legal authority, the Court concludes that appropriate remedy is not to strike Dr. Rose's report in its entirety, but to strike the offending language from the report and preclude him from considering, relying on, and testifying about the offending language.

To recap, Dr. Rose was retained by Defendant to conduct an independent medical examination ("IME") of James R. and Jacob Pennington (hereinafter "Plaintiffs"). He was asked to opine as to whether Plaintiffs had PTSD, and if so, the causal relationship between that diagnosis and the events that occurred while they were students in the Flora School District (Doc. 54-1, p. 3- Depo). On the date of the IME, as Dr. Rose approached

the waiting room to meet Plaintiffs, he overheard one of them speaking and subsequently learned that Plaintiffs' attorney was also present in the room. Dr. Rose incorporated the communication into the report that he authored following the IME.

> When I went to the waiting room to meet the two brothers, I paused for a moment to listen before opening the door and making my presence known as is my well-trained clinical habit. What I heard was a young man's voice verbally going through, sharing, and/or rehearsing aloud a narrative of negative events that had occurred at his prior school and which are relevant to this case. When I opened the door and made my presence known, I immediately determined that the voice I heard belonged to James. I already readily recognized the presence of Jacob as well as their father. There was another man in the room who I was not expecting and subsequently introduced himself as the attorney for the family on this relevant case. While I did not say anything explicitly, I was and am concerned about the atypical presence of an evaluatee's legal counsel immediately prior to an independent evaluation, which was only compounded by the verbal rehearsing of a narrative of events relevant to the present case and in the presence of said counsel. I believe that at least one effect of counsel's presence may be the initially very rehearsed nature of James's narrative as at first, he was not responding to my questions directly but was instead perseverating on and switching among several major narrative events. It took significant effort to redirect him to a fluid, thoughtful, and chronological delivery of information thankfully, after the initial difficulties, James was able to stick to a mostly chronological delivery of information while being given ample and explicit opportunities to contribute any information that he felt was not adequately addressed.

(Doc. 84-1, pp. 2–3).

The Court previously determined that James R.'s statements in the waiting room in the presence of his attorney were protected by attorney-client privilege, and therefore improperly disclosed by Dr. Rose in his report (Doc. 72, pp. 7–14, 16). As for the proper remedy, the Court indicated that it was "inclined to strike Dr. Rose's report and preclude him from testifying at trial" but held off on making a decision so the parties could brief the issue (*Id.* at pp. 16, 21).

Both parties filed briefs as ordered. In Plaintiffs' brief, they contend that "Dr. Rose engaged in a surreptitious activity by secretly eavesdropping on Plaintiff[s'] privileged attorney-client communications, then devoted an entire analysis of the communications in his IME report." (Doc. 83, p. 3). They claim that "Dr. Rose's secret eavesdropping caused him to believe James was 'rehearsing' his story [,which] clearly tainted his view of James and Jacob, tainted his exam, and tainted his report." (*Id.* at p. 4). Plaintiffs argue that the proper remedy is to strike Dr. Rose's entire report and preclude him from testifying at trial (*Id.* at pp. 3, 4). They further argue that simply excising the offending portion from Dr. Rose's report would not "appropriately address the severity of Dr. Rose's actions." (*Id.*). Excluding him entirely would "hel[p] prevent abusive litigation practices," like eavesdropping and disclosing privileged communications, and is the only way to prevent unfair prejudice to Plaintiffs, confusion of the issues, and misleading the jury (*Id.*).

Defendant, on the other hand, argues that barring Dr. Rose is a severe and drastic punishment that does not fit the "crime" (Doc. 84). Defendant argues that Plaintiffs failed to provide any evidence as to what particular confidential information was transmitted to Dr. Rose and note that he heard a "rehearsal" (*Id.*). Defendant is presumably implying that everything Dr. Rose overheard James R. say in the waiting room was later openly disclosed during the interview, so nothing he overheard was truly confidential. But even assuming the "rehearsal" was privileged in nature, there is no evidence Dr. Rose's report or his opinions were infected by what he overheard (*Id.*). Defendant claims that Dr. Rose disregarded his knowledge of the communication during the interview, and it was not

the basis for any of Dr. Rose's opinions (*Id.*). Defendant argues that, under the circumstances, the appropriate remedy is to simply strike the offending portion from Dr. Rose's report and order him not to testify about the privileged communication.

"Federal courts have inherent power to disqualify expert witnesses where or when it is necessary to protect the integrity of the adversary process, and/or to promote public confidence in the legal system. *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 500 F. Supp. 2d 957, 959–60 (N.D. Ill. 2007) (citing *Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers LLC,* 202 F.R.D. 426 (E.D. Pa. 2001)). *Accord Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, 840 F. Supp. 2d 1072, 1078 (N.D. Ill. 2012). "Disqualification is a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Allstate*, 840 F.Supp.2d at 1078 (quoting *BP Amoco,* 500 F.Supp.2d at 960).

As previously noted on a number of occasions, neither the parties nor the Court has been able to find any case law directly on point with the situation at hand (Doc. 72, p. 11; *see also* Doc. 83, p. 2; Doc. 84, p. 3). The Court has found guidance, however, from other cases involving experts with knowledge of confidential information. The most common scenario involves an expert who has "obtained confidential information directly from the moving party and then testifies for the opponent." *Allstate*, 840 F.Supp.2d at 1083. In other words, the expert "switches sides." *Id.* (quoting *Chamberlain Grp., Inc. v. Interlogix, Inc.*, No. 01 C 6157, 2002 WL 653893, at *5 (N.D. Ill. Apr. 19, 2002)). *See also Lifewatch Serv. Inc. v. Braemer Inc.*, No. 09 C 6001, 2010 WL 3909483, at *2 (N.D. Ill. Sept. 28, 2010). In these cases, courts look at whether the party seeking disqualification has shown that it had a confidential relationship with the expert and actually transmitted

confidential information to them. *Allstate*, 840 F.Supp.2d at 1083; *BP Amoco*, 500 F. Supp. 2d at 960.

Those concerns are obviously not present here—there is no indication Dr. Rose had a pre-existing relationship of any type with Plaintiffs or Plaintiffs' counsel. However, it is helpful to know that in the cases involving an expert's conflict of interest, disqualification was not warranted if there was not "a substantial relationship between confidential information acquired and the matters to which the expert is expected to testify." *Allstate*, 840 F.Supp.2d at 1083 (citation omitted). *See also Chamberlain*, 2002 WL 653893, at *3, 4, 5 (declining to disqualify an expert who was previously exposed to confidential business information of the moving party's predecessor when moving party failed to establish that information was related to the subject matter of the expert's testimony). Disqualification was also not warranted if the confidential information did not impact the expert's opinion. *See Allstate*, 840 F.Supp.2d at 1083 (declining to disqualify expert and instead striking references to confidential information in expert's report where expert did not actively consider or rely upon that information in forming his opinion); *Poulter v. Cottrell, Inc.*, No. 12 C 01071, 2014 WL 5293595, at *5 (N.D. Ill. June 24, 2014) (rejecting argument that plaintiff's expert had to be disqualified because he was "tainted" where expert testified he disregarded the problematic document and it did not factor into his opinions; "the mere fact of his brief exposure to it does not disqualify him."); *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2021 WL 1100431, at *5 (M.D. Tenn. Mar. 17, 2021) (rejecting argument that defendant's witnesses had to be excluded where the moving party did not "identif[y] any basis for concluding that these witnesses' testimony would

be irredeemably tainted by their exposure to any particular privileged information.").

Other helpful cases involve eavesdroppers listening in on attorney-client communications. In the previous Order, the Court cited to *Reid v. Womack*, where a paralegal in the waiting room at the law office of the plaintiffs' attorney overheard a conversation the defendant and his attorney were having prior to a deposition (Doc. 72, p. 11 n.2). *Reid v. Womack*, No. 2:11-CV-788, 2014 WL 4094465, at *3–4 (D. Utah Aug. 18, 2014). The paralegal prepared an affidavit detailing what she heard, which plaintiffs' counsel wanted to use as evidence in opposing summary judgment. *Id.* Based on the specific facts of the conversation, the court determined that it was privileged attorney-client communication and sustained defendant's objection to plaintiffs' use of the affidavit. *Id.*

Additionally, Plaintiffs cited to *People v. Shrier*, 190 Cal. App. 4th 400 (Cal. Ct. App. 2010) (Doc. 83). In that case, law enforcement agents intentionally eavesdropped on conversations between three criminal defendants and their attorneys while they were at the attorney general's office reviewing evidence that had been seized. *Id.* at 406–08. The trial court found the government's conduct was "outrageous" and could not be "accepted or glossed over," and ordered the criminal case to be dismissed as a remedy. *Id.* at 409. The Court of Appeals, however, held that dismissal was too drastic of a remedy because, for one thing, the eavesdropping was not orchestrated by the prosecutor. *Id.* at 417. It was orchestrated by the lead case agent and the prosecutor was completely unaware of the plan. *Id.* The Court of Appeals determined the appropriate remedy was to bar the use of any information gleaned from the eavesdropping and any derivative evidence which

may have flowed therefrom. *Id.* at 419. The Court believes the salient takeaway from this case is that in determining the appropriate remedy for a violation of attorney-client privilege, courts should consider the intent of the eavesdropper and whether the eavesdropper was acting at the behest of an attorney involved in the case.

Its clear Dr. Rose should not be allowed to include the privileged information in his expert report and that Defendant cannot in any way rely on the privileged information or use it against Plaintiffs. The question for the Court is whether it should exclude Dr. Rose's report, preclude him from testifying at trial, and allow a new IME to be conducted. Or, whether the offending language should be stricken and the witness precluded from relying on it in any way. The caselaw suggests that in making this determination, the Court should consider whether the expert intentionally eavesdropped on the conversation, and if so, whether it was at counsel's behest. The Court should also consider the effect the privileged information had on the expert and whether the expert actively considered or relied on the information in forming their opinions.

Here, the undisputed evidence is that defense counsel did not induce Dr. Rose to violate the attorney-client privilege. It is also clear from the evidence that Dr. Rose did not set out intending to or trying to overhear privileged attorney-client communications. He testified he was not told an attorney was going to be present, he "had no idea" who Plaintiffs' attorney was until the attorney introduced himself, and he was "genuinely surprised by the presence of the attorney" (Doc. 54-1, pp. 17, 18, 19). Dr. Rose further testified that he paused to listen before entering the room because as a psychiatrist, he was trained as a "normal standard and practice" that if he heard something as he was

approaching the room, he should pause and listen for a few seconds and then proceed (*Id.* at pp. 15, 17). He testified that this is a "well-trained clinical habit" and a "reflex" that is "ingrained" in psychiatrists (*Id.*). He explained that the purpose of this practice is to take in information outside of the formal evaluation that may be relevant and helpful in evaluating a person's psychological functioning and deriving a forensic opinion, *e.g.,* their tone of voice, demeanor, mood, behavior, etc. (*Id.* at p. 15). Furthermore, Dr. Rose testified he was only outside of the door for "mere seconds" before walking in (*Id.* at p. 17). This brief timeframe is consistent with the idea that Dr. Rose was listening for the purpose of taking in information about the individual's mental status. It stands to reason that if he was trying to secretly listen to the content of what was being said, he would have stood there for much longer and tried to hear as much as possible before opening the door and announcing his presence.

The Court further notes there is no evidence Dr. Rose disclosed the privileged attorney-client communication in bad faith or for the purpose of affording some kind of tactical advantage to Defendant. By all appearances, he included it in his report in the interest of candor and because he believed it was professionally responsible to do so. Specifically, Dr. Rose explained that in his experience, having an attorney present immediately before an IME was atypical (Doc. 54-1, pp. 18–19). He had never experienced it, none of his mentors had ever mentioned it happening to them, and he was not taught that it was normative during his training (*Id.*). He further explained that psychiatrists are trained to mention any irregularity that occurred in the evaluation process because it might be an important or useful piece of information to someone else reading the report

(*see id.* at pp. 18–19, 20, 21–22).

As for whether overhearing the privileged attorney-client communication had any impact on Dr. Rose, Plaintiffs contend that "Dr. Rose's secret eavesdropping caused him to believe James was 'rehearsing' his story[, which] clearly tainted his view of James and Jacob, tainted his exam, and tainted his report." (Doc. 83, p. 4). However, Plaintiffs do not provide any explanation or cite to illustrative examples from Dr. Rose's report or deposition testimony to support their argument (*see* Doc. 83). In the Court's view, the evidence simply does not support Plaintiffs' contention. Dr. Rose did not definitively state that James R. was "rehearsing" his story, which would carry a negative connotation. Instead, Dr. Rose wrote in his report that he heard James R. "*going through, sharing, and/or rehearsing* aloud a narrative of negative events" (Doc. 84-1, p. 2) (emphasis added). Dr. Rose explained that he recounted the communication in this manner using "and/or" and three "very vague" "examples of possibilities" because he was trying to convey that he did not actually know the exact nature or purpose of the communication, *i.e.*, if James R. was talking to his attorney, to his dad, to Jacob, or to himself, and for what purpose (Doc. 54-1, pp. 18, 26).

Furthermore, Plaintiffs' counsel probed Dr. Rose as to whether the communication "in any way colored [the] examination" (Doc. 54-1, p. 25). Dr. Rose said he thought it potentially explained why James R. was having trouble during the initial part of the interview responding to the questions directly (Doc. 54-1, p. 25; *see also* Doc. 84-1, p. 3). He said James R. was "perseverating" on the same points that Dr. Rose heard him say in the waiting room, and this "bullet point list" of events "jump[ed] around chronologically

all over the place with no sense of timeline" (Doc. 54-1, p. 25; *see also* Doc. 84-1, p. 3). Dr. Rose explained this made the initial part of the interview "quite difficult" because he was trying to go through James R.'s life "in a chronological fashion" because chronology is important for the type of evaluation he was conducting (Doc. 54-1, pp. 25, 26). Notably, however, Dr. Rose did not remotely suggest that overhearing the communication created some type of bias or negative feelings for him toward the boys, corrupted or changed the course of the examination, or influenced his ultimate opinions in the case (*see* Doc. 54-1; Doc. 84-1). The Court does not believe that overhearing this type of communication would undoubtedly cause Dr. Rose to have some type of bias or negative feelings toward Plaintiffs. Perhaps it would taint the outlook of a layperson, but not a trained psychiatrist well-versed in how the autistic brain functions and how autism manifests itself (*see, e.g.,* Doc. 54-1, pp. 27–28).

But even if Dr. Rose believed that James R. was rehearsing his story with his attorney, it does not appear that belief had any lasting impact. Dr. Rose said he was able to redirect James R. and get him to talk about things chronologically (Doc. 54-1, p. 26; *see also* Doc. 84-1, p. 3). Dr. Rose even went on to say that while James R.'s style of response made the initial part of the interview difficult, it "didn't matter" because it was informative on some level given that "things like perseveration" are "part of a mental status exam." (Doc. 54-1, p. 25).

Plaintiffs' counsel also asked Dr. Rose about the significance of the communication he overheard (Doc. 54-1, pp. 21–22). Dr. Rose explained that he included information about the communication in the section of his report where he "set the stage" and

described the objective facts of how the evaluation proceeded, *e.g.,* the length of the interview, whether any breaks were taken, how informed consent was obtained, etc. (*Id.*; *see* Doc. 84-1, pp. 2–3). In other words, it was background information. In fact, Dr. Rose testified that he could not even remember specifically what James R. said or which events James R. recounted (Doc. 54-1, p. 25). Ultimately, the Court believes that the communication Dr. Rose overheard did not pervade or infect his ultimate opinions. Plaintiffs did not identify anything showing that Dr. Rose actively considered the communication or the contents when forming his ultimate opinions (*see* Doc. 83). And there is nothing that suggests Dr. Rose would have reached a different opinion had he not heard James R. talking in the waiting room prior to beginning the exam.

In sum, after reviewing the parties' arguments and the aforementioned case law, the Court is unconvinced that Dr. Rose's report is irredeemably tainted by the attorney-client communication he overheard. As a result, the Court declines to strike Dr. Rose's report, preclude him from testifying and order a new IME. Under the circumstances present here, the Court finds that the appropriate remedy is to strike any reference to the privileged attorney-client communication from Dr. Rose's report. This remedy maintains the confidentiality of the privileged communication and prevents the prejudice and confusion that could result from its inclusion.

Accordingly, it is **ORDERED** that Dr. Rose shall not consider or rely upon the privileged attorney-client communication that he overheard in the preparation of his expert report in this case or in the testimony he provides at trial. It is further **ORDERED** that Dr. Rose shall modify his report in the manner proposed by Defendant to strike any

reference to the attorney-client communication (*see* Doc. 84-1). It is further **ORDERED** that counsel for both sides shall refrain from examining Dr. Rose on anything related to the privileged attorney-client communication.

**IT IS SO ORDERED.**

**DATED: February 8, 2023**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**
