**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JAMES PENNINGTON, JR.,** | ) | |
| **as guardian of the Estates of James R.** | ) | |
| **Pennington and Jacob Pennington,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:20-CV-11-MAB** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **FLORA COMMUNITY UNIT SCHOOL** | ) | |
| **DISTRICT NO. 35,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motion for summary judgment and motion to exclude Plaintiffs' expert, both filed by Defendant Flora Community Unit School District No. 35 ("School District" or "District") (Doc. 96, Doc. 98). Plaintiff filed responses in opposition to both motions (Docs. 99, 100). Defendant did not file reply briefs.

## BACKGROUND

James Pennington, Jr., brought this action on behalf of his two sons, James and Jacob, who are twins and who are both autistic.[1] The suit alleges that while the boys were students in the Flora School District, the District allowed other students to bully them, failed to address the situation to prevent further bullying against them, and, in some

---

[1] For the sake of clarity in this Order, since the father and one of his sons share the same name, the father will be referred to as Mr. Pennington and the son will be referred to as James. Mr. Pennington and both of his sons are collectively referred to as "Plaintiffs" throughout this Order.

cases, participated in the bullying. The suit further alleges that the bullying caused the boys severe mental anguish and led to both being diagnosed with post-traumatic stress disorder. Plaintiffs are proceeding against the District for violations of the Rehabilitation Act ("Rehab Act"), the Americans with Disabilities Act ("ADA"), the Equal Protection Clause, and the Illinois Human Rights Act (Doc. 1), as well as claims for willful and wanton conduct (Doc. 73; *see also* Doc. 90).

## FACTS

The parties each submitted their own statements of fact and did not respond to one another's (*see* Docs. 97, 100). The facts asserted by each are therefore deemed admitted to the extent that they are supported by evidence in the record. *See* FED. R. CIV. P. 56(e)(2); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citations omitted). They are also supplemented by other facts the Court came across in its review of the evidence that felt especially pertinent to the issues on summary judgment.

James and Jacob are twins, born in 2003, who have Autism Spectrum Disorder (Doc. 97-4, pp. 6–7 (Jacob depo); Doc. 97-1, pp. 9, 73 (Diana Pennington depo)). They both have also been diagnosed with anxiety, depression, posttraumatic stress disorder ("PTSD"), and obsessive-compulsive disorder ("OCD"), and Jacob has also been diagnosed with attention deficit/hyperactivity disorder ("ADHD") (Doc. 97-1, pp. 9, 73). Jacob has an IQ of 49 and James has an IQ of 50 (*Id.* at p. 74). According to their former treating psychiatric provider, the boys "are very low functioning" and "have obsessive thoughts . . . repeat themselves often . . . [and] don't socialize well" (Doc. 98-3, pp. 49, 51).

Mrs. Pennington testified that James and Jacob started getting bullied in fourth or

fifth grade (Doc. 97-1, p. 18). The first time Mr. Pennington remembers he and his wife

reporting an incident of the boys being bullied was when the boys were in fifth grade

(Doc. 97-7, pp. 22–25). Students threw dodge balls at James, which left bruises on his face,

while two teachers watched but did not intervene (Doc. 97-7, p. 22; Doc. 97-1, pp. 31, 81–

82; *see also* Doc. 97-3, pp. 23–26). According to James, it was B.P. and S.H. who threw the

balls at him, and Ms. Booth and Ms. Countryman who watched and laughed at him (Doc.

97-3, pp. 23–26); *see also* Doc. 97-7, p. 22). Mr. Pennington said the school "blew it off like

nothing" (Doc. 97-7, p. 23). That same school year, Mr. and Mrs. Pennington told three

teachers, including Ms. Booth and Ms. Countryman, that other students were calling

James and Jacob "stupid" and "retarded" (Doc. 97-7, p. 23). He said Ms. Countryman

"flat out ignored [him]" (*Id.*).

It is undisputed that the bullying incidents continued during the 2015-2016 school

year, when the boys were in 6th grade. It was difficult for the Court to identify testimony

specific to this year. Jacob testified that certain students, including A.G., M.D., Z.B., and

A.S. were mean, rude, and insulting to him, gave him "dirty looks," and/or ignored him

(Doc. 97-4, pp. 27, 30–31, 33, 34). Another student, T.S., called James and Jacob "mentally

retarded" (*Id.* at pp. 35–36). Neither Jacob nor James could definitively recall if they

reported any instances of bullying during sixth grade to school officials (*see* Doc. 97-4, pp.

35, 36, 37; Doc. 97-3, p. 26).

The Penningtons all agree that the bullying incidents intensified during the 2016–

2017 and the 2017–2018 school years, when the boys were in seventh and eighth grade.

Mrs. Pennington testified that "it really started getting bad . . . when they got in junior

high" (Doc. 97-1, p. 18). Mr. Pennington said that the bullying happened "every day" (Doc. 97-7, p. 15). James likewise reported daily bullying (*see* Doc. 97-3, p. 40), and Jacob testified that "[a]lmost every day me and my brother would go to school and people would bully us. It would happen almost every day." (Doc. 97-4, p. 21).

Jacob said that "[u]sually when something happened [he] would go up to the office and report it," mostly to the secretary (Doc. 97-4, pp. 12–13, 14). Other times, he would tell a teacher if he happened to see them but did not often do so "because none of [the teachers] had nothing nice to say about me. they would insult me and put me down" (*Id.* at pp. 13–14, 21). James likewise said he grew to be afraid to report anything to teachers because he thought "they would yell at [him]" and he did not trust them (Doc. 97-3, pp. 123, 127–28, 129). James said he talked to Principal Amy Leonard about being bullied, but "most of the time she just didn't believe what I said" (*Id.* at pp. 43–45).

The boys did, however, frequently report incidents to their parents (*see* Doc. 97-3, Doc. 97-4), who, in turn, reported to the school. Mr. Pennington said he spoke to district staff about his sons being bullied "all the time" — what "seemed like every week" (Doc. 97-3, pp. 26, 83; *see also* pp. 52, 76–77, 81–82). Mrs. Pennington likewise said she spoke to Principal Leonard and Superintendent Hackney "all the time . . . about every week" (Doc. 97-1, pp. 42–43; *see also* p. 39). But no matter how many times they reported issues, the school did "nothing" and "[i]t just kept happening" (Doc. 97-7, p. 25). Frustrated with the school's lack of action, Mr. Pennington started filing police reports, and he also called news stations and wrote letters to various politicians (*Id.* at pp. 16, 38, 52, 84).

As for the bullying the boys endured in seventh and eighth grade, they said C.B.

would frequently push them in the hallway (Doc. 97-4, p. 42; Doc. 97-3, p. 133). Kids would whisper about them and point and laugh (Doc. 97-4, pp. 44–46; Doc. 97-3, pp. 69–70, 71). Multiple students, including S.H., B.P., M.D., and D.H., would "sa[y] how retarded me and my brother are, how stupid we are in the society, how we're not like them . . ." (Doc. 97-3, p. 40).

Mrs. Pennington talked about an incident in seventh grade where Jacob was eating lunch at a table by himself and a kid walked up to him and spit juice all over him, completely unprovoked (Doc. 97-1, pp. 14, 43–44, 79). Mrs. Pennington reported the incident to Principal Leonard and asked if Jacob could start eating lunch in the office (like the former principal allowed him to do in sixth grade), but Principal Leonard said "no, because she had other kids in there to deal with" (*Id.*).

In February 2017, Z.B called Jacob and James "retarded and stupid" in class, and James walked out of the classroom and slammed the door (Doc. 97-3, pp. 86, 133–34). The teacher, Ms. Kohn, followed him and asked why he slammed the door (*Id.*). James told her what Z.B. said, and Ms. Kohn replied, "still that does not give you a reason to slam my door" (*Id.*). There is no evidence as to whether Ms. Kohn took any action with respect to Z.B. James said there was another incident when Z.B. and M.S. "ke[pt] saying you and your brother are not fantastic. You guys are just awful people. You guys just need to pass away and die. . . . [Y]ou're so retarded . . . ." (*Id.* at pp. 134–35). Jacob also testified that Z.B. and M.S. frequently "insult[ed]" and "pick[ed] on us," "calling us stupid and retarded" (Doc. 97-4, p. 19, 20–21, 22).

On April 18, 2017, C.B. stabbed James in the arm with a pencil during science class

(Doc. 97-1, pp. 23–24; Doc. 97-3, pp. 13–14, 27–28; Doc. 97-7, pp. 26–27; *see also* Doc. 97-2, p. 1 (letter re: incident); Doc. 97-9 (discipline report)). The school did not take James to the hospital, which was "right across the street," but rather called Mr. and Mrs. Pennington and told them that James had been stabbed and needed to be picked up (Doc. 97-1, pp. 23; Doc. 97-7, pp. 26–27). When Mr. and Mrs. Pennington got to the school, the pencil was still in James's arm (Doc. 97-1, p. 23). They had to take him to the hospital for a doctor to remove the wood and lead from his arm (*Id.*; *see also* Doc. 97-7, p. 27).

Principal Leonard was notified about the incident and spoke with the teacher, James, C.B., and at least one other student who had been sitting nearby (Doc. 97-2, p. 1; Doc. 97-6, pp. 13–15). She was told that C.B. was passing papers up to James and hitting James in the head with them (Doc. 97-2, p. 1; *see also* Doc. 97-9). James took the papers and retaliated, hitting C.B. with the papers (Doc. 97-2, p. 1; *see also* Doc. 97-9). C.B. then swung his hand toward the papers—while holding a pencil—and stabbed James in the wrist (Doc. 97-2, p. 1; *see also* Doc. 97-9). C.B. was given one day of in-school suspension and two days of out-of-school suspension for stabbing James (Doc. 97-9; Doc. 97-6, p. 21). In a letter to the Penningtons following the incident, Principal Leonard stated that she was "not able to uncover any ongoing harassment . . . or back story to the incident" and determined that "the incident was isolated" (Doc. 97-2, p. 1). The letter further states that C.B. was disciplined, that C.B. and James would be separated from each other in class, and that teachers and staff would "diligently monitor" passing periods and lunch (*Id.*). James testified that in the days following the incident, he heard C.B. and his friends, K.R. and S.H., talking and whispering in the hallways about the stabbing (Doc. 97-3, pp. 27–

28).

A few weeks later, while in the gym for some kind of assembly or celebration, B.P. and D.B were taunting James, pointing at him, making fun of his parents, and calling him and Jacob "stupid," "morons," and "retarded" (Doc. 97-3, pp. 60–62, 89). James said as soon as the bell rang, he ran out of the school crying and almost got hit by a car (*Id.*). There were also other incidents where B.P. and/or D.B. called James and Jacob "retarded," "stupid," "and unintelligent," said they were "unfit to be in a school system" and "not good enough for life" (*Id.* at pp. 64, 65, 66–67, 108). D.B. also called them "Forrest Gump" and said they were "losers" (*Id.* at pp. 128–29).

James talked about S.H. tormenting him on numerous occasions. He said there was a time that S.H. "pushed his seat against my back and it . . . really hurt a lot" (Doc. 97-3, pp. 14, 121, 123). Another time in P.E. class, S.H. lifted him up and squeezed him and wouldn't let go (*Id.* at pp. 9, 20, 90, 121, 123–25). S.H. and K.R. would hold the door to the locker room shut and basically trap James inside, while they laughed at him (*Id.* at pp. 9, 50, 54–55). S.H., K.R., and T.S. would "whisper of how retarded me and my brother were or how [c]hallenged we are as a human being" (Doc. 97-3, pp. 18–19). Jacob also said that S.H. said "mean, rude things, like how stupid I am or how retarded I am . . ." and K.R. would "insult me and my brother and just be mean . . . [p]retty much every - - every other day" (Doc. 97-4, pp. 11, 67–68). James and Jacob both testified that when they were in the bathroom stalls, S.H. would kick the stall (*Id.* at pp. 8–9, 65–66; Doc. 97-3, p. 18). Jacob said S.H. also did it to other kids and "guess[ed]" that S.H. was "just mean to certain people that he didn't like . . . or that didn't fit in his way[.]" (Doc. 97-4, p. 66).

Mr. Pennington also testified about the locker room incidents:

> These boys would come in there, and they would pick on them. Like I said, they would tell them you guys are a couple of queers. You and your brother are gay. You're retarded, stupid. They would come home and tell us this all the time. You guys suck each other's dicks. They would constantly say that to them. You're a couple of faggots. They would smack the locker room doors real hard, yell at them, slap them, nudge them with their elbow, spit on them, they would kick the bathroom stall doors . . . .

(Doc. 97-7, pp. 27–28). James and Jacob grew so "terrified" of the locker room abuse that they quit dressing out for PE, and were then punished with detentions (*Id.*; Doc. 97-1, p. 16). It is undisputed that Jacob reported S.H.'s conduct in the locker room to the teacher, Mr. Carmody, (Doc. 97, p. 3; Doc. 100, p. 4; *see also* Doc. 97-4, pp. 67, 77), but there is no evidence as to what, if any, action Mr. Carmody took.

The abuse in PE class culminated in October 2017 when K.R., T.S., and three other boys spent the hour "intimidating," "constantly badgering" and repeatedly "bullying" James, as stated in the disciplinary reports from the incident (Doc. 97-5, pp. 370–74). According to James, K.R. asked him if he performed oral sex on Jacob and then T.S. asked James if his parents bought "sex magazines" for him and Jacob (Doc. 97-3, pp. 10, 22–23, 29; *see also* Doc. 97-4, pp. 8, 40–41; Doc. 97-7, p. 28). The boys then started hitting James and throwing shoes at him (Doc. 97-3, pp. 10, 22–23; Doc. 97-6, pp. 30–31, 49). The disciplinary reports state, "[t]he incident was caught on camera and it was very disturbing" (Doc. 97-5, p. 370). Principal Leonard was notified, and she spoke with all of the boys involved (Doc. 97-6, pp. 30–31). Four of the boys were suspended for three days, and the fifth was suspended for one day (*Id.*; *see also* Doc. 97-5, pp. 370–74). There is no evidence as to what, if any, other actions were taken by the school. This incident

prompted Mr. Pennington to tell the local news that his autistic sons were being bullied at school and nothing was being done about it (*see* Doc. 97-6, p. 33; *see also* 98-2, p. 3).[2]

There were more incidents in 2018 during the second half of the boys' eighth grade year. James testified that T.S. would call him names and "a failure," and say things like, "hey, retar[d]" or "hey, stupid" (Doc. 97-3, p. 119, 120). In February 2018, E.P. accused James in front of other students of touching her buttocks (*Id.* at pp. 47–50, 110–12). James said, "all the kids were laughing at [him]," while three boys, S.H., K.R., and I.S., taunted him and said they were going to tell the principal (*Id.* at pp. 47, 49, 51). James testified that he told Principal Leonard about the incident, and she responded, "[Y]ou did touch that girl's butt. We all know you did. We kind of have video proof of that" (*Id.* at p. 51). A school counselor spoke to James the next day; he told her what he had been accused of and said that "the boys in his class will not stop saying mean things to him" (Doc. 97-3, pp. 45–46). The counselor asked James what coping skills he used in the situation (*Id.*). There is no evidence as to what, if any, other actions were taken by Principal Leonard or the counselor.

In March 2018, James was accused by other students of urinating in a trashcan. According to James, he was standing by a trashcan outside of the building and trying to zip up his coat because it was very cold (Doc. 97-3, p. 11). Suddenly he heard D.H. screaming, "I see your penis. I see your penis" (*Id.* at pp. 11, 21–22, 41–42). Principal

---

[2] *See* Venton Blandin, *Father: My twins who have autism are being bullied, school is doing nothing about it*, WRAL NEWS, Oct. 30, 2017, available at https://www.wral.com/story/father-my-twins-who-have-autism-are-being-bullied-school-is-doing-nothing-about-it/17070924/ (last visited March 25, 2024).

Leonard came outside and D.H. and another student told her that James had urinated in the trash (*Id.*; *see also* Doc. 97-6, p. 43). Principal Leonard said James denied it and "was upset" (Doc. 97-6, p. 44). Principal Leonard followed James out to his dad's car, and Mr. Pennington and James went back to the office with her (*Id.*). She testified that she called the police, the School Resource Officer Mr. Borders, and the Superintendent Joel Hackney because, if the students had seen James urinate in the trash can like they said, "that would have been indecent exposure" (*Id.* at pp. 44, 54, 55). Principal Leonard watched the security footage and acknowledged that, "you couldn't see [James's] private parts," you could only "see him up against the trashcan." (*Id.* at p. 44). Mr. Pennington said he was also shown the video, and it was obvious that the trashcan was too tall for James to urinate in while standing right next to it, and "you could see clearly" that James was just trying to zip his jacket (Doc. 97-7, pp. 29–30). James's parents both testified that he has trouble using zippers (*Id.*; Doc. 97-1, p. 46). Mrs. Pennington explained, "[James] would stand like this and fidget" with his zipper, trying to zip it up (Doc. 97-1, p. 46).

James and his dad had to go to the police station for further questioning (Doc. 97-7, p. 30; Doc. 97-6, p. 55). James was suspended for four days, three for "his actions" and one "for the way he reacted, cussing at me and cussing and screaming on the way to meet his dad at the van" (Doc. 97-2, p. 2 (Disciplinary Report)). James is adamant that he never urinated in the trashcan.

Both Mr. and Mrs. Pennington testified about the fallout from the incident. Mrs. Pennington said:

> [James] got in trouble from Joel Hackney. He got in trouble from Ms.

Leonard. They took him to the police station. They were going to arrest him for it, and it was such a big deal and so important to them and got spread around the whole school, and they just thought it was so funny . . . .

(Doc. 97-1, p. 46). Mr. Pennington said:

[James] was trying to murder himself after that. Our son tried to hang himself in his closet. I can't tell you what that's like as a parent to watch your kids try and murder themselves over this and watching them curl up in a little ball every day begging for death. You don't know what that's like. I do.

(Doc. 97-7, p. 31).

The boys went back to school in the fall of 2018 for their freshman year (*see* Doc. 97-7, p. 86). But there was an incident during the first week of September, where Jacob came out of school "crying . . . uncontrollably" and James was shouting about people being mean to his brother (*Id.* at p. 87; *see also* Doc. 97-3, pp. 12–13, 72, 73, 90; Doc. 97-4, pp. 10–11, 15–17, 62–63, 75–77). Mr. Pennington asked the principal, Toby Pearce, who was standing in front of the building, what happened and why the boys were upset (Doc. 97-7, p. 88). But Mr. Pearce said "nothing. Nothing happened" and refused to give Mr. Pennington any information or to allow him to talk to the boys' teacher (*Id.* at pp. 88, 89). Mr. Pennington went back to the car, where he learned what happened. He explained that "there was a wooden chair that . . . was old and kind of splintery looking," and Jacob "has this thing about his clothes. He doesn't want to get holes in his clothes . . . ," so he asked if he could sit in a metal chair that was in the room instead of the wooden one (*Id.* at p. 89). The teacher responded, "No . . . you're not going to use your autism as an excuse in here. You sit where we tell you to sit." (*Id.*). Jacob started crying and "they" (presumably meaning the teacher(s) and/or other staff in the room) were yelling at him

to sit down (*Id.*). Jacob and James both ran out of the classroom and out of the school in tears (*Id.* at pp. 89–90). Jacob testified that he tried reporting the incident to Principal Pearce, but Pearce "kind of ignored" him and inexplicably offered him a bag of chips (Doc. 97-4, pp. 75–76).

The Penningtons withdrew the boys from school the day after the chair incident (Doc. 97-2, p. 3; *see also* Doc. 97-7, pp. 90–91). They reenrolled them later that semester after the School District agreed to transfer them to TLC, which is a special school (Doc. 97-1, p. 87). 87). Mrs. Pennington testified:

> The only reason [the District] did all that is because we got a lawyer. . . . [S]ince sixth grade I've been asking them to put them in TLC where they can be around kids that are like them and have teachers who know how to deal with them, and they wouldn't do it, and then we go and get a lawyer and have to pay thousands of dollars, and then they go ahead and put them in there.

(Doc. 97-1, pp. 87–88). She further testified that the boys "love TLC" and are "doing really good there" (*Id.* at p. 88). They are learning life skills, programming and coping skills, are doing well academically and behaviorally and TLC has not had any problems with the boys. (*Id.* at pp. 88–89; *see also* Doc. 97-7, pp. 12–13).

Mr. and Mrs. Pennington testified about the effect the bullying had on the boys. Their dad said James and Jacob closed themselves off to the world and became too afraid to leave the house or to join any teams (Doc. 97-7, pp. 12, 71). They became suicidal and were taken to the emergency room on numerous occasions and hospitalized multiple times for suicidal ideations and/or incidents of self-harm (Doc. 97-7, pp. 10, 14, 31, 68, 69, 95–97; Doc. 97-3, pp. 113–14, 126; Doc. 98-2, pp. 3, 4, 5 (Dr. Cuneo report); *see also* Doc. 98-

3, p. 46 (Szatkowski depo)). James and Jacob were both diagnosed with posttraumatic stress disorder (Doc. 98-4, pp. 17, 18). They have panic attacks—Jacob's are especially debilitating—which require medication to manage (Doc. 97-1, pp. 95, 101; Doc. 97-7, pp. 32–34, 103; Doc. 98-4, pp. 35, 37, 38, 73–74 (Dr. Cole depo)). They have nightmares and need to be medicated in order to sleep (Doc. 97-7, pp. 34, 106–07; Doc. 98-4, pp. 40, 60). They suffer from paranoia. Mr. Pennington said Jacob has an irrational fear of sitting in wooden chairs (Doc. 97-7, pp. 86, 90). Mrs. Pennington said Jacob will no longer sit in wooden chairs at restaurants, and he refused to ride a roller coaster at Holiday World that had wooden seats (Doc. 97-1, p. 83). James lives in constant fear that he is going to be arrested and thrown in jail (Doc. 97-3, pp. 16, 53, 80–81; Doc. 97-1, pp. 90–91, 103; Doc. 97-7, pp. 32–34, 100). The boys are terrified to use the restroom and often need someone to stand guard for them, even at home, and even in the middle of the night (*see* Doc. 97-7, pp. 36, 102–03; Doc. 97-3, p. 19). Mr. Pennington testified that he "honestly believe[s] [his] sons are permanently damaged . . . from what happened to them" (Doc. 97-7, p. 104).

## MOTION TO EXCLUDE

Plaintiffs retained Daniel J. Cuneo, Ph.D., a clinical psychologist, as an expert witness. Dr. Cuneo ultimately produced a five-page report and sat for a deposition (Docs. 98-1, 98-2). The School District seeks to exclude his report and any reference, evidence, testimony, or mention of his opinions, arguing that Dr. Cuneo is not qualified to offer the opinions and does not have a sufficient basis for his opinions (Doc. 98, p. 1).

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced by the Supreme Court in *Daubert v. Merrell Dow Pharm.*,

*Inc.*, 509 U.S. 579 (1993). *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). *See also Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (explaining that the general standards derived from *Daubert* are "essentially codified in the current version of Rule 702" and *Daubert* "remains the gold standard for evaluating the reliability of expert testimony") (citation omitted); *accord Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 n.1 (7th Cir. 2017).

Under Rule 702, expert testimony is admissible if (1) the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) the witness's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the witness has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702. In short, Rule 702 "requires the district court to act as an evidentiary gatekeeper," *Krik*, 870 F.3d at 674 (citing *Daubert*, 509 U.S. at 589), to ensure that expert witnesses are qualified to give the opinion they seek to offer and that their testimony "is not only relevant, but reliable." *Manpower*, 732 F.3d at 806 (quoting *Daubert*, 509 U.S. at 589). It is "a flexible standard with broad discretion given to district court" to determine the admissibility of the expert opinion testimony. *Krik*, 870 F.3d at 674 (citations omitted). In determining relevance and reliability, the party offering the expert testimony bears the burden of proof. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)).

The Court did not conduct a hearing on the *Daubert* motion because the record is

adequate to decide the motions without one. Additionally, the parties did not indicate a hearing was necessary or set forth what missing information a hearing would supply. *See Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) ("[A] *Daubert* hearing is [not] always required**.**"); *Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067 (7th Cir. 1998) (no automatic entitlement to a *Daubert* hearing because the Seventh Circuit has "not required that the *Daubert* inquiry take any specific form").

The District advances four arguments in support of its motion and the Court will address each in the order the District raised them. The District's first argument is that Dr. Cuneo's expert opinion rests purely on speculation (Doc. 98). But this argument is a non-starter. A careful review of Dr. Cuneo's report and his deposition transcript reveals that he reviewed thousands of pages of disclosures and written discovery from this case, over 1,000 pages of medical records, police and court records, and other miscellaneous documents (Doc. 98-2, pp. 1–2; Doc. 99-3). Moreover, he met with both Mr. and Mrs. Pennington and interviewed them at his office on May 6, 2021 (Doc. 99-3). He also conducted evaluations of both James and Jacob on May 10, 2021 (*see* Doc. 99-3). His report carefully outlines his factual findings as well as the opinions he is offering based on those factual findings (Doc. 99-3, pp. 3-6). Accordingly, Dr. Cuneo's opinions are predicated on sufficient facts and any issues the District has on this subject can be explored through cross-examination.

The District's next argument is that Dr. Cuneo relies on "insufficient, inconsistent, and unreliably supported facts laden with a bias towards Plaintiffs" and offers legal conclusions (Doc. 98, pp. 7-8). But the District's argument on this point is far too general

and undeveloped. Its arguments are made through passing references, which makes it difficult for the Court to meaningfully address. Suffice to say that the Court has already determined that Dr. Cuneo's opinion are predicated on sufficient facts. Any issue the District has with how well Dr. Cuneo explained the boys' symptoms or their diagnoses can be explored on cross-examination, if necessary,[3] but it is not a basis to exclude Dr. Cuneo as an expert.

Next, the District claims that Dr. Cuneo is not qualified to offer expert opinions regarding the field of special education or the appropriateness of an IEP (Doc. 98, p. 8). Dr. Cuneo is a clinical psychologist, licensed in Illinois and Missouri (Doc. 99-1). He has worked in the field of clinical psychology for over forty years, he is currently self-employed, and his work experience includes 24 years of employment with the Illinois Department of Mental Health, which includes time serving as the clinical director at Chester Mental Health Center (Docs. 99-1; 99-2). Dr. Cuneo has also served as a board member of the St. Louis County Special School District for 24 years and, at the time of his deposition, served as the president of that board (Doc. 99-2).[4] Indeed, Dr. Cuneo has researched or spoken on PTSD, childhood trauma, the Diagnostic and Statistical Manual of Mental Disorders 5 (often referred to as DSM-5), developmental disabilities in children,

---

[3] The District also took issue with the fact that Dr. Cuneo failed to "distinguish the two children in his report, commingling them both for purposes of diagnosis and impact" (Doc. 98). But a review of Dr. Cuneo's deposition reveals that this was not even an issue, as questions were posed to Dr. Cuneo specifically about James and specifically about Jacob. The Court suspects the same will be true at trial.

[4] Dr. Cuneo explained that in St. Louis County, there are 22 separate school districts, and all special education services and vocational services come under the umbrella of the St. Louis County Special School District (Doc. 99-2, p.6).

mental health, and special education services for youth, to name just a few (Docs. 99-1, 99-2).[5] In sum, Dr. Cuneo's professional background, education, work experience, and areas of research qualify him to serve as an expert in this case and offer his opinions to the jury. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (explaining "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area"). The Districts' contentions that Dr. Cuneo has never developed an IEP or participated in the implementation of one may be potential subjects for cross-examination, but they are not a sufficient basis to find that he is not qualified to opine on this subject or serve as an expert in this case. *Loontjens v. Sentry Ins.*, No. 13-CV-1217-JPS, 2014 WL 5305893, at *5 (E.D. Wis. Oct. 15, 2014) ("However, nothing in Rule 702 or in the jurisprudence interpreting the rule indicates that an expert must have specific knowledge about the precise object of the litigation."). Given Dr. Cuneo's twenty-plus years of service as a board member of the St. Louis County Special School District and research in the areas of special education for children, the Court believes he is qualified to offer his opinions in the area of special education and the appropriateness of the boys IEP in 2016 and 2017.

Finally, the District contends that the probative value of Dr. Cuneo's testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and

---

[5] Dr. Cuneo's CV is 26 pages in length, and meticulously outlines his education, work experience, board service, speaking engagements, and publications (Doc. 99-1).

the tendency that his testimony will mislead the jury (Doc. 98); *see also* FED. R. EVID. 403.[6] Ultimately, the District's argument focuses on what it says is an incorrect assertion of Dr. Cuneo and the fact that Dr. Cuneo imputed "knowledge to the school district" after only speaking to students and their parents (Doc. 98, p. 9). But once again, these contentions may be fair game for cross-examination at trial, but they are not a basis to exclude Dr. Cuneo's opinions. *Smith*, 215 F.3d at 719 ("It is not the trial court's role to decide whether an expert's opinion is correct."). The District's critiques here go to the weight of the evidence the jury may afford Dr. Cuneo's testimony, not its admissibility under Rule 403. *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 723 (N.D. Ill. 2001) ("Factual inaccuracies are to be explored through cross-examination and go toward the weight and credibility of the evidence not admissibility.").

In sum, Dr. Cuneo is qualified to serve as an expert, his testimony will assist the trier of fact and it is based on sufficient facts. The District did not really make any argument that Dr. Cuneo's opinions are not the product of a reliable principles and methods and the Court has no reason to believe otherwise. The District's motion to exclude Dr. Cuneo as an expert (Doc. 98) is denied.

### SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R.

---

[6] In any relevance analysis, the Court typically begins with Rule 401, which defines relevant evidence. *See* FED. R. EVID. 401. But by skipping straight to Rule 403, the District appears to concede that Dr. Cuneo's testimony and opinions are relevant under Rule 401.

CIV. P. 56(a). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court's task is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is a genuine material dispute of fact that requires a trial. *Stewart*, 14 F.4th at 760; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

**DISCUSSION**

Plaintiffs bring a number of state and federal claims in this case. The Court will start with the federal claims because if judgment is granted on those, the Court could decline to hear the state ones, leaving them instead for state court.

## A. REHAB ACT & ADA

In Counts 3 through 6, Plaintiffs allege that the School District violated Title II of the ADA and § 504 of the Rehabilitation Act, "both of which prohibit discrimination against the disabled." *H.P. by & through W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018) (citation omitted). *See also* 42 U.S.C. § 12132; 29 U.S.C. § 794(a).

The Court notes that neither the Supreme Court nor the Court of Appeals for the

Seventh Circuit has addressed school district liability under § 504 and the ADA for peer-to-peer disability-based harassment. However, other circuit courts, as well as district courts in this circuit, have applied the framework set forth in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999), for school district liability for peer-to-peer sexual harassment in violation of Title IX. *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 75, 76 (4th Cir. 2016) ("Like most of the federal courts to consider the question, we think it clear that [*Davis*'s] reasoning applies to § 504 claims arising from student-on-student harassment or bullying. . . . § 504's operative language is strikingly similar to Title IX's"); *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995–96 (5th Cir. 2014) (citing cases from other circuits); *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453–54 (6th Cir. 2008); *Doe v. Bd. of Educ. of City of Chi.*, 2020 WL 1445638, at *5 (N.D. Ill. 2020); *Vargas v. Madison Metro. Sch. Dist.*, No. 18-CV-272-SLC, 2019 WL 2173928, at *4, 5 (W.D. Wis. May 20, 2019); *Martin v. E. St. Louis Sch. Dist. #189*, No. 14-CV-1393-MJR-SCW, 2016 WL 1718332, at *5 (S.D. Ill. Apr. 29, 2016). Defendant contends that the *Davis* deliberate indifference standard should be applied (Doc. 97, p. 11), and Plaintiff effectively agrees (Doc. 100, p. 10). The Court will therefore evaluate Plaintiffs' claims accordingly.

To succeed on their claims against the District for peer-to-peer disability-based harassment under the Rehab Act and the ADA, Plaintiffs must show that (1) James and Jacob had a disability, (2) they were harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of their education and created an abusive educational environment, (4) the District knew of the harassment, and (5) the District was deliberately indifferent to the harassment. *E.g., S.B.*, 819 F.3d at 76.

The School District does not dispute the first and fourth elements: that the boys had a disability and that it knew of the harassment (*see* Doc. 97, pp. 9–15). The District does, however, challenge the second and third elements: that the harassment was based on the boys' disabilities and severe and pervasive, and the fifth element: that it was deliberately indifferent to the harassment (*Id.* at pp. 11–15).

### 1. Whether the Harassment was Disability-Based

The School District argues that "[t]he undisputed material facts fail to show that the locker room or bathroom incident(s) was harassment on the basis of disability" (Doc. 97, p. 11). Jacob testified S.H. would also kick other student's bathroom doors, which the District argues is proof that S.H. did not single out James and Jacob for harassment (*Id.* at pp. 11–12). The District also claims that Plaintiffs' have nothing more than their own speculation that S.H.'s actions were motivated by their disabilities (*Id.*).

The District's argument, however, addresses only one particular type of alleged abuse, by one perpetrator and seems to ignore all the others. It also does not account for James and Jacob's testimony about the numerous occasions where S.H. and other students called them names such as morons, stupid, retarded, challenged, etc. This type of name-calling is sufficient to create an issue of fact as to whether the harassment James and Jacob faced was on account of their disability.[7]

---

[7] *See D.A. v. Meridian Joint Sch. Dist. No. 2*, 289 F.R.D. 614, 618, 628, 631 (D. Idaho 2013) (finding enough to withstand summary judgment on disability-based harassment claim where teenager diagnosed with Asperger's Syndrome and High Functioning Autism Spectrum Disorder was called "retard"); *Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 242 (W.D.N.Y. 2012) (holding plaintiff sufficiently alleged harassment was connected to his disability when he had Asperger's Syndrome and was repeatedly called a "retard" and an "autistic piece of shit."); *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 358 (S.D.N.Y. 2005) (finding enough to withstand summary judgment on disability-based harassment claim

## 2. Whether the Harassment was Severe and Pervasive

In order to be actionable, a plaintiff must establish peer-on-peer harassment that is "so severe, pervasive, and objectively offensive, and . . . so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). In other words, "[t]he harassment must have a 'concrete, negative effect' on the victim's education," such as "dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (quoting *Davis*, 526 U.S. at 654). Determining whether the harassment is actionable "depends on a constellation of surrounding circumstances, expectations, and relationships," *Davis*, 526 U.S. at 651.

The School District argues that the undisputed material facts show the alleged harassment was not severe or pervasive (Doc. 97, p. 12). The District says, "[w]hile Plaintiffs cite to several incidents of alleged bullying," those incidents involved "different offenders that engaged in alleged harassment on different dates, often months and years apart." (*Id.*). The District further remarks that only seven incidents were reported to the district between 2017 and 2018, and "[a]s such, the incidents as alleged could not as a

---

where teenager with pervasive developmental disorder (which is now referred to as austism) was called "stupid," "idiot," "retard" and other "disability-related insults"); *Bowe v. Eau Claire Area Sch. Dist.*, No. 16-cv-746-jdp, 2017 WL 1458822, at *2 (W.D. Wis. Apr. 24, 2017) (where classmates stated that plaintiff was stupid and had mental deficiencies "the content of this verbal abuse sufficiently pleads a link between the harassment and Bowe's disability").

matter of law result in a systemic denial of programs or activities" (*Id.* at pp. 12–13).

But in considering the full evidentiary picture and construing it in a light most favorable to Plaintiffs, which it must, the Court is unpersuaded by the District's argument. The seven incidents that the District pointed to were not discrete incidents that occurred in isolation. Rather, there is evidence that James and Jacob were bullied in some form or fashion almost every day for at least two years, if not longer. Plaintiffs' evidence shows that the boys were subjected to harassment, intimidation, verbal taunts, public humiliation, laughs, jeers, and whispers. James was beaten with shoes and stabbed with a pencil. The boys stopped dressing out for PE in order to avoid locker room abuse. They became suicidal. And the harassment eventually drove the boys to withdraw from school. Plaintiffs' evidence also shows that the boys have been diagnosed with PTSD, have panic attacks, difficulty sleeping, and irrational fears of wooden chairs, going to prison, and using the bathroom alone. A reasonable jury could find that the totality of the harassment the boys endured was so severe and pervasive that it changed the conditions of their education and created an abusive education environment.[8]

### 3. Whether the School District was Deliberately Indifferent

---

[8] *See Davis*, 526 U.S. at 650–51 (harassment that causes "overt, physical deprivation of access to school resources," such as "a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource[, like] an athletic field or a computer lab," can trigger a damages claim). *Cf. Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 667 (2d Cir. 2012) (student who was taunted and harassed nearly every day for three and a half years because of his race, as well as menaced, threatened and physically assaulted could be perceived as sufficiently severe); *C.S. v. Couch*, 843 F.Supp.2d 894, 908 (N.D. Ind. 2011) (ten instances of racial slurs and violence over four-and-a-half years could be perceived as sufficiently severe). *See also Doe v. Galster*, 768 F.3d 611, 618–19 (7th Cir. 2014) (discussing cases in which harassment was found to be sufficiently severe).

Deliberate indifference in the context of student-on-student harassment means that the school's response, or lack thereof, to known acts of harassment during school hours and on school grounds was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 646, 648. In other words, the school's response amounts to "an official decision . . . not to remedy" the harassment. *Id.* at p. 642. That "does not mean [schools] can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action" *Id.* at 648. Rather, it means schools must take "timely and reasonable measures" to investigate and end the harassment. *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) (quoting *Wills v. Brown University*, 184 F.3d 20, 25 (1st Cir. 1999).[9] And if a school then learns that its remedial action was inadequate and ineffective, it is required to take further steps to avoid liability. *Vance*, 231 F.3d at 261 (quoting *Wills*, 184 F.3d at 25).

A look at what does not constitute deliberate indifference is instructive. In *S.S. v. Eastern Kentucky University*, 532 F.3d 445 (6th Cir.2008), a disabled middle-school student complained that he was being bullied and harassed. The record showed that the school responded to all of the alleged incidents involving S.S. of which it was made aware, and its responses included conducting individual and group interviews with S.S.'s classmates

---

[9] In *Davis,* the Supreme Court cited the Department of Education, Office of Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034, 12039–12040 (1997) (OCR Title IX Guidelines). *Davis,* 526 U.S. at 647–648. The OCR Guidelines state: "Once a school has notice of possible sexual harassment of students . . . it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." OCR Title IX Guidelines, 62 Fed. Reg. at 12042.

in an attempt to determine who was at fault, instructing S.S.'s classmates not to taunt him, arranging for outside speakers to talk to the students about name-calling, identifying related topics for discussion at school assemblies and in small groups, monitoring S.S., separating S.S. from other students who had been involved in the altercations, holding a mediation session between S.S. and another student, disciplining both S.S. and the other students who were found to be at fault, calling the police, having the police talk to an offending student, and calling the other students' and S.S.'s parents to discuss the disciplinary problems. *Id.* at 455. The Sixth Circuit held that the evidence did not give rise to an inference that the school was deliberately indifferent. *Id.* at 455–56.

In *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014), a female student complained that she was bullied by male classmates. The record showed that "after every reported or observed incident of bullying involving Doe, school officials promptly intervened. As the incidents persisted and escalated, so did the school's responses." *Id.* at 620. Teachers admonished the offending student. *Id.* at 614–16, 620–21. Guidance counselors and school psychologists were brought in to speak to the victim. *Id.* When the incidents continued, school officials took measures to keep the offending student and the victim away from each other by having the students sign an agreement to stay away from each other, assigning them to different rooms, and moving their lockers away from one another. *Id.* When the incidents continued and became violent, the students' parents were called, an investigation was launched, and three boys were expelled. *Id.* The Seventh Circuit found that the school's responses to the known acts of severe peer harassment were not deliberately indifferent. *Id.* at pp. 621–22. *See also Vance*, 231 F.3d at 261 (discussing cases

in which schools could be or were found deliberately indifferent)

Here, the School District argues that it was not deliberately indifferent because there were only seven incidents reported to the school, Principal Leonard investigated four of them, and issued discipline in two of them (Doc. 97, pp. 12–13). But implicit in the School District's argument is a recognition that there were three times when no action was taken in response to instances of bullying that were either reported to or witnessed by school personnel. This includes the 2017 locker room and bathroom incidents with S.H., the February 2017 incident when Z.B. call James and Jacob "retarded and stupid," and the September 2018 incident when a teacher told James and Jacob not to use their autism as an excuse (*see id.*). Moreover, Plaintiffs' evidence, if credited, shows that in addition to the seven incidents acknowledged by the District, there were many other incidents reported to school officials, where no action was taken.

The School District also contends that for many of the reports made by Mr. and Mrs. Pennington about bullying, "there is no evidence that the parents presented information . . . sufficient for the District to identify and investigate said incidents" (Doc. 97, p. 14). This argument misses the mark. The deliberate indifference analysis focuses on the District's response to the Penningtons' reports of bullying. And the District is essentially saying that it did not get specific enough information from Mr. and Mrs. Pennington and therefore declined to act, even in the face of frequent and repeated reports. It is clear, however, from other cases that regardless of the quality of the reports received, the District could have taken some action. For example, the District could have taken measures, like those taken in *S.S. v. Eastern Kentucky University*, and conducted

individual and group interviews with James and Jacob's classmates and their teachers to gather additional information after each incident or arranged for a speaker to educate the boys' classmates (or the school as a whole) on the impact of name-calling or bullying in general. The District did not, however, provide any evidence of such efforts or offer any explanation as to why it felt that such efforts were unnecessary (*see* Doc. 97). Moreover, there is evidence that the Penningtons' reports, at least on some occasions, were very specific and were not just generalized complaints about bullying devoid of any specifics on the who, what, when, and where.

Finally, as Plaintiffs note, the District failed to establish a bullying policy that complied with the section of the Illinois School Code titled "Bullying Prevention," 105 ILL. COMP. STAT 5/27-23.7 (hereinafter "Bullying Prevention statute") (Doc. 100, pp. 7–8). Specifically, the District's policy did not contain the correct definition of bullying. It said, "Bullying is deliberate and hurtful behavior that is 'repeated' over a period of time toward the same person." (Doc. 100-5, p. 15). However, the statute does not require repeated instances or a pattern of conduct. *See* 105 ILL. COMP. STAT. 5/27-23.7 ("'Bullying' . . . means any *severe or pervasive* physical or verbal act or conduct . . . ) (emphasis added).[10]

---

[10] The statute defines bullying as:
> Any severe or pervasive physical or verbal act or conduct, including communications made in writing or electronically, directed toward a student or students that has or can be reasonably predicted to have the effect of one or more of the following:
> > (1) placing the student or students in reasonable fear of harm to the student's or students' person or property;
> > (2) causing a substantially detrimental effect on the student's or students' physical or mental health;
> > (3) substantially interfering with the student's or students' academic performance; or
> > (4) substantially interfering with the student's or students' ability to participate in

And Principal Leonard admitted that she relied on the erroneous definition of bullying (*see* Doc. 97-6, pp. 24–25).

For all of these reasons, the District has not established that its responses to the known acts of bullying were reasonable as a matter of law and thus did rise to deliberate indifference.

In sum, in viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that James and Jacob were subjected to severe and pervasive disability-based harassment by their peers that altered the conditions of their school experience and to which the District was deliberately indifferent. Accordingly, the District's motion for summary judgment as to Counts 3–6 is denied.

### B. WILLFUL AND WANTON CONDUCT

Counts 1 and 2 are against the School District for willful and wanton conduct (Doc. 73). In these Counts, Plaintiffs focus on the School District's anti-bullying policy. Specifically, Plaintiffs contend there is evidence that the District acted willfully and wantonly when its anti-bullying policy did not comply with the Bullying Prevention statute and Principal Leonard—the "Chief Bullying Investigator"—did not know the correct definition of bullying under Illinois law (Doc. 100, pp. 7–9, 9–10; *see also* Doc. 73,

---

       or benefit from the services, activities, or privileges provided by a school.
    Bullying, as defined in this subsection (b), may take various forms, including without limitation one or more of the following: harassment, threats, intimidation, stalking, physical violence, sexual harassment, sexual violence, theft, public humiliation, destruction of property, or retaliation for asserting or alleging an act of bullying. This list is meant to be illustrative and non-exhaustive.

105 ILL. COMP. STAT. 5/27-23.7(b).

pp. 11–15). Plaintiffs also contend that Principal Leonard's handling of the pencil stabbing incident failed to comply with the Bullying Prevention statute and even the District's own "illegal" anti-bullying policy because Leonard did not treat it as an act of bullying despite prior, repeated reports of harassment towards James and Jacob (Doc. 100, pp. 7–9, 9–10).

The School District argues that it is entitled to summary judgment on Counts 1 and 2 because it is immunized from liability under the Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILL. COMP. STAT. 10/1-101.1, *et seq.* (Doc. 97, pp. 6–9). The District first points to Section 3-108 of the Tort Immunity Act (*Id.* at p. 6). This section immunizes local public entities and public employees against injuries proximately caused by negligence in supervising an activity on, or the use of, any public property. 745 ILCS 10/3-108(a). Plaintiffs did not raise any concern as to the applicability of section 3-108 to the present circumstances, and therefore the Court assumes, for the purposes of this discussion, that it applies. As the School District acknowledges, section 3-108 does not protect against liability for willful and wanton conduct (Doc. 97, p. 7). The District argues in a general fashion that:

> the evidence demonstrates the District undertook efforts to prevent and respond to every instance of bullying of which it was aware. It meted out discipline to students, notified teachers, separated aggressors from victims, and documented its decisions. Even if the District was negligent in the adoption of policy, its conduct and that of its agents does not, as a matter of law, even begin to meet the level of willful and wanton conduct.

(Doc. 97, p. 8). However, this argument does not address the conduct identified by Plaintiffs as the basis of their willful and wanton claims. Moreover, a jury could choose not to credit the District's characterization of its employees' responses to the bullying.

And, as the Court already explained, there is an issue of fact as to whether the District's employees acted with deliberate indifference, and therefore the Court likewise thinks the question of whether the conduct at issue was willful and wanton is best left to a jury to decide. *See Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001) ("[T]he standard for assessing whether conduct is willful and wanton is 'remarkably similar' to the deliberate indifference standard.") (citation omitted).

The District next points to sections 2-201 and 2-109 of the Tort Immunity Act (Doc. 97, p. 8), which it previously (and unsuccessfully) invoked in its motion to dismiss (*see* Doc. 90, pp. 11–16). These two sections, taken together, immunize a public entity from liability for "discretionary policy determinations" made by its employees. 745 ILL. COMP. STAT. 10/2-109, 10/2-201; *Smith v. Waukegan Park Dist.*, 896 N.E.2d 232, 236–37 (Ill. 2008); *Murray v. Chicago Youth Ctr.*, 864 N.E.2d 176, 186 (Ill. 2007). Importantly, these sections "provid[e] absolute immunity for both negligence and willful and wanton conduct." *Andrews v. Metro. Water Reclamation Dist. of Greater Chicago*, 160 N.E.3d 895, 905 (Ill. 2019). In order for the District to be granted immunity under sections 2-201 and 2-109, it must show two things. First, it must show that its employee (whose act or omission caused the plaintiff's injury) held a position that "involve[d] either formulating policy or exercising discretion." *Albers v. Breen*, 806 N.E.2d 667, 675 (Ill. App. Ct. 2004). *Accord Andrews*, 160 N.E.3d at 905. Second, it must show that the employee's particular act or omission involved "*both* a determination of policy *and* an exercise of discretion." *Albers*, 806 N.E.2d at 675 (emphasis in original). *Accord Andrews*, 160 N.E.3d at 905.

The District does not identify the individual employees who made the decisions

at issue or make any argument that these employees held positions that "involve either formulating policy or exercising discretion" (*see* Doc. 97, pp. 6–9). But Plaintiffs also do not raise any challenge to this element (*see* Doc. 100). And the Court does not think there is any real debate on the issue. Principal Leonard made some of the decisions at issue, and it is also possible that Superintendent Hackney and/or the School Board made some. Public school board members, school administrators, and district administrators serve in positions that involve formulating policy and/or exercising discretion. *See, e.g., Harrison v. Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 758 N.E.2d 848, 852, 853 (Ill. 2001) (implicitly holding that school principal satisfied the first requirement for immunity under 2-201); *Hascall v. Williams*, 996 N.E.2d 1168, 1175 (Ill. App. Ct. 2013) (plaintiff admitted that defendants—school principal, district superintendent, and the district school board—held positions that involve determination of policy or exercise of discretion).

The question is really whether the particular actions and/or omissions at issue involved "*both* a determination of policy *and* an exercise of discretion." The District argues generally that "[t]he acts or omissions complained of by the Plaintiffs constitute discretionary acts and policy determinations" and "[w]hile adoption of the policy may be a ministerial act, implementation of the policy . . . is a wholly discretionary function" (Doc. 97, p. 8). The District did not, however, explain what constitutes a policy decision under Illinois law or how to distinguish between discretionary and ministerial actions, nor did it cite to any illustrative case law (*see id.*). Additionally, there is no discussion regarding the specific facts of the case and why they amounted to discretionary policy decisions (*see id.*), even though the Illinois Supreme Court has instructed that this

determination "resists precise formulation" and must "be made on a case-by-case basis in light of the particular facts and circumstances." *Monson v. City of Danville*, 115 N.E.3d 81, 91 (Ill. 2018) (citing *Snyder v. Curran Twp.*, 657 N.E.2d 988, 992 (Ill. 1995)).

It is possible that the District is correct and the actions at issue did involve both a determination of policy and an exercise of discretion, but the Court cannot say so as a matter of law because the District's briefing is far too general and devoid of specifics on this subject. *See Bank of Am., N.A. v. Veluchamy*, 643 F.3d 185, 190 (7th Cir. 2011) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citation omitted); *United States v. Courtright*, 632 F.3d 363, 370 (7th Cir. 2011) ("[Courts] are not in the business of formulating arguments for the parties."). Consequently, this aspect of the motion for summary judgment is denied.

### C. Equal Protection

In Counts 7 and 8, Plaintiffs allege that the District discriminated against James and Jacob because of their disabilities when addressing their complaints of harassment, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983 (Doc. 73).

The Fourteenth Amendment subjects disability-based classifications to rational basis review. *Ostrowski v. Lake Cnty.*, 33 F.4th 960, 966 (7th Cir. 2022) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446, (1985) (holding that mental disability is not a suspect classification subject to heightened scrutiny under the Equal Protection Clause)). "To prevail under the rational basis standard, a plaintiff must prove that '(1) the

defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest." *Reinebold v. Bruce*, 18 F.4th 922, 925 (7th Cir. 2021) (quoting *Smith v. City of Chicago*, 457 F.3d 643, 650–51 (7th Cir. 2006)).

The District argues that Plaintiffs cannot prove the first element of the test because they do not have any evidence of similarly-situated students who were treated better (Doc. 97, pp. 16–17). Plaintiffs did not dispute the District's argument nor attempt to identify any comparators (*see* Doc. 100, pp. 11–12). Consequently, the District is entitled to summary judgment on the Equal Protection claims. *See Reinebold*, 18 F.4th at 925 ("To show he was intentionally treated less favorably than others similarly situated, [plaintiff] must introduce evidence of similarly situated comparators.") (citations omitted).

### D.  ILLINOIS HUMAN RIGHTS ACT

Plaintiffs allege in Counts 9 and 10 that the School District violated the Illinois Human Rights Act when it failed to take any action to stop or correct the severe and pervasive bullying and harassment that James and Jacob were facing due to their disabilities (Doc. 73). *See* 775 ILL. COMP. STAT. 5/5-102.2.

The District again argues that Plaintiffs failed to provide evidence that the harassment was severe or pervasive (Doc. 97, p. 19). However, the Court has already found this argument unavailing. *See supra* at pp. 22-23. The District next argues there is no evidence that it failed to take corrective action to remedy the bullying and harassment that James and Jacob were experiencing (Doc. 97, p. 19). But as previously explained, the

District implicitly acknowledged that there were several instances of bullying where no action was taken, and Plaintiffs' evidence, if believed shows many more. *See supra* at p. 26. Consequently, the District has not demonstrated that it is entitled to summary judgment on Counts 9 and 10.

<u>CONCLUSION</u>

Defendant's motion to exclude Plaintiffs' expert, Daniel J. Cuneo (Doc. 98) is **DENIED**. Defendant's motion for summary judgment (Doc. 96) is **GRANTED IN PART and DENIED IN PART.** It is **GRANTED** as to the Equal Protection claims (Counts 7 and 8). It is **DENIED** with respect to all other counts. The case will proceed to trial on Plaintiffs' Willful and Wanton claims (Counts 1 and 2); the ADA and Rehab Act claims (Counts 3-6); and the claims under the Illinois Human Rights Act (Counts 9 and 10).

A status conference to discuss the trial schedule and the utility of additional mediation will be set by a separate Order.

**IT IS SO ORDERED.**

**DATED: March 25, 2024**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**